## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CRIMINAL NO.  3:17-cr-30090-MJR |
| | ) | |
| TEREZE L. FENDERSON, | ) | |
| | ) | |
| Defendant. | ) | |

### GOVERNMENT'S SENTENCING MEMORANDUM

Now comes, The United States of America, by and through Steven D. Weinhoeft, United States Attorney for the Southern District of Illinois, who provides the Court with the Government's Sentencing Memorandum.

## I.   INTRODUCTION:

Born into the impoverished Parkside Neighborhood in East St. Louis, Ill., Tereze Fenderson grew up around guns, drugs, violence, and gang activity. His father was absent during his formative years and he was raised by his mother and maternal grandmother, who together tried to care for 13 children.

Fenderson's life followed a downward trajectory. He dropped out of school in the eighth grade, began using drugs and alcohol by age 12, and entered the criminal justice system as a juvenile. He never established meaningful employment and got by on the streets. His background is replete with the arrests and convictions that come with this lifestyle, such as drug distribution, weapon possession, and property

damage. But his record also shows an arrest for murder in 1999[1] and a separate conviction for involuntary manslaughter for shooting and killing a man in 2005. Fenderson, himself, has been shot on three different occasions – in 2003, 2011, and 2013.

It is against this backdrop that Tereze Fenderson found himself as a 37 year old drug dealer caught up in a Title III investigation into a drug trafficking organization operating from Mexico and Arizona into Illinois. A federal search warrant led to his indictment on gun charges, where he was released on bond. But instead of reassessing his life, Fenderson doubled-down on what he had learned from a lifetime on the streets and he sought revenge against T.R. – the individual he blamed for "snitching" to the police about his drug dealing.

Fenderson caught up to T.R. on October 22, 2017, where he and a second shooter unleashed a hail of gunfire, leaving T.R. seriously injured. Fortunately, T.R. was not killed. But, he is in hiding, isolated, out of the fear of harm to himself and his family members. T.R.'s injuries are severe, and he is scheduled to soon undergo his fourth surgery to repair the physical damage done to him during the shooting. The psychological damage will undoubtedly take longer to heal.

All violent crime is serious. But, there is something particularly egregious when criminals like Fenderson retaliate against those who are perceived to have spoken to law enforcement because that retribution is specifically calculated to

---

[1] The details of the murder arrest are absent from the PSR and no inference of wrongdoing should be made by reference to the fact of an arrest. But, the incident serves as another illustration that Fenderson was on notice of the consequences of violent crime.

undermine the very system of justice necessary to maintain order in society. Simply put, this type of crime is designed to undermine law enforcement so that violent criminals can rule the streets with impunity. Few crimes are more serious. A sentence commensurate with the gravity of the offense is called for in this case.

## II.   OFFENSE CONDUCT:

### A.   THE ORIGINAL INVESTIGATION

Federal authorities were investigating a large drug trafficking organization operating throughout Arizona and Mexico that was supplying drugs to the East St. Louis area. The organization delivered multi-hundred-pound loads of marijuana to Fenderson's residence on a monthly basis where it was broken down and further distributed to local dealers, including T.R. Agents learned that the organization also shipped approximately ten pounds of marijuana bi-weekly through the United States Postal Service to supplement the multi-hundred-pound loads. The Bureau of Alcohol, Tobacco, and Firearms (BATF) were told that Fenderson had been in possession of two assault rifles and three handguns as a convicted felon. The Title III investigation, along with seized mail packages and informant statements, supplied probable cause to search Fenderson's house.

On February 5, 2016, the BATF executed a search warrant at Tereze Fenderson's home. Fenderson ran inside from the front porch when police arrived and he locked the door as they approached. Agents forced their way into the home, where multiple doors were reinforced with steel bars, and a security monitor was located in the living room. Agents found more than four pounds of marijuana, along with

packaging materials, and a 9mm semi-automatic pistol on the dining room table. Fenderson waived his *Miranda* rights and admitted that the gun was his, and that he had purchased it from "some crackhead" for $200. Approximately 68 lbs. of Fenderson's marijuana was separately recovered from his girlfriend's house.

T.R. came to Fenderson's house while agents were executing the warrant. T.R. was a long-term friend who had distributed hundred-pound quantities of marijuana for Fenderson in the past. T.R. spoke to investigators at the scene, was released without arrest, and faced no charges. Fenderson blamed T.R. for the 68 pound drug seizure because T.R. was reportedly the only person who knew that Fenderson kept large amounts of drugs at his girlfriend's house. Fenderson was not indicted until May 16, 2017, because the larger Title III investigation was ongoing.

**B.    FENDERSON IS INDICTED AND ARRESTED**

On May 16, 2017, Fenderson was indicted for unlawfully possessing a firearm as a convicted felon. The US Marshals Service executed the arrest warrant on September 20, 2017, when approximately $13,000 in cash was discovered and seized from his residence.[2]

The relationship between T.R. and Fenderson had deteriorated after the execution of the original February 5, 2016, search warrant. T.R. began avoiding, and ceased engaging in marijuana transactions with, Fenderson who accused T.R. of "snitching" to law enforcement. But, the situation worsened after Fenderson's

---

[2]    Following the initial appearance and arraignment, Fenderson was placed on pre-trial release pursuant to an order of the United States District Court for the Southern District of Illinois, dated September 20, 2017, (Cause No. 3:17-cr-30090-MJR, Doc. 12). That order notified Fenderson of the potential effect and consequences of committing an offense while on pretrial release.

September 20, 2017, arrest and the resulting $13,000 cash seizure. T.R. was aware of Fenderson's simmering hostility, and did his best to avoid Fenderson.

### C.   <u>FENDERSON ATTACKS T.R.</u>

Less than a month after Fenderson's arrest and the $13,000 cash seizure, T.R. was at a party at Spanky's Lounge, in East St Louis. Pictures of the event "tagging" T.R. were publicly viewable on social media threads. On October 22, 2017, at 2:53 a.m., T.R. was standing on the sidewalk outside of the bar when Fenderson pulled up driving a black Mazda CX-7 crossover SUV. He never tried to enter the bar. Rather, Fenderson went immediately to T.R.

There were two other people in the car with Fenderson when he arrived. Individual #2 got out of the back seat and accompanied Fenderson as he confronted T.R.. Individual #3 remained in the front passenger's seat the entire time.

A video recording shows T.R. backing away and walking into the street to get distance from an obviously threatening situation. A mutual friend interceded during the confrontation and engaged Fenderson while T.R. walked further down the street trying to get out of sight.

At no point did Fenderson or Individual #2 attempt to enter the bar. Rather, after T.R. fled, they went directly back to the car with Fenderson driving and Individual #2 returning to the back seat. Fenderson then circled the block, hunting for T.R. They found T.R. hiding near the intersection of 15th and Piggott Streets about two minutes later. Fenderson stopped the car and both he and Individual #2 opened fire, shooting at T.R., striking him in the hip and lower leg. T.R. hid behind a parked

car and returned fire three times from his own handgun, causing Fenderson to speed away.

T.R. was taken to a nearby hospital for treatment. A shot to T.R.'s lower leg broke both of the bones, requiring multiple surgeries to repair.

T.R. surrendered his firearm to the police. That gun appears to have been owned lawfully, and T.R. possessed an Illinois FOID card. That firearm was compared to shell casings found at the scene, which confirmed that T.R. fired three shots from the yard behind a parked car as he described.

Fourteen (14) spent shell casings, from two other guns, were found in 15th Street, where T.R. said the Mazda CX-7 stopped to shoot. Four (4) of those shell casings were from a 9 mm handgun, while ten (10) other casings were fired from a .40 caliber firearm. Further investigation revealed that Fenderson had the 9 mm handgun, while Individual #2 shot the .40 caliber.

Fenderson was on federal pre-trial release at the time of the shooting, so officers tried to contact him through his supervising probation officer. But he was evasive and refused to come in. His bond was revoked, a warrant was issued, and he was arrested on November 2, 2017, in possession of a bag of marijuana, three cellular phones, and $5,800 in cash. When interviewed, he lied about being involved in the shooting and provided a false alibi. Additionally, the distinct clothing he was recorded wearing during the shooting were recovered in his home.

### III.   APPLICATION OF 18 U.S.C. § 3553 SENTENCING FACTORS:

The Court is required to impose an appropriate sentence that satisfies the prescribed goals of protecting the public, promoting respect for the law, and providing just punishment for the offense. See, 18 U.S.C. § 3553(a)(2). In determining the appropriate sentence, this Court must consider the following enumerated statutory factors:

(1) *§3553(a)(1):* nature and circumstances of the offense and the history and characteristics of the defendant;

*Nature and Circumstances of the Offense:*

The retaliatory motive for this crime is an extremely aggravating factor for sentencing.

It has been widely reported that East St. Louis, Ill., has experienced the highest per capita murder rate in America from 2015-2017.[3] This violence is part of a complex cycle of societal breakdown involving drugs, poverty, public corruption, and other economic and social factors. But one of the most destructive of these social factors is the so-called "code of the streets."[4] The street code is a shorthand way of describing toxic norms and expectations that are consciously opposed to the norms that govern mainstream society. It is a set of informal rules that governs behavior, including the use of violence, in blighted areas. The most well-known of these street

---

[3]      2018 - https://www.neighborhoodscout.com/blog/highest-murder-rate-cities
          2017 - https://www.neighborhoodscout.com/blog/highest-murder-rate-cities-2017
          2016 - https://www.neighborhoodscout.com/blog/highest-murder-rate-cities-2016
          2015 - https://www.neighborhoodscout.com/blog/highest-murder-rate-cities-2015
[4]      See, https://www.theatlantic.com/magazine/archive/1994/05/the-code-of-the-streets/306601/ (visited December 27, 2018).

rules applies to "snitches." The street code encourages violent retaliation against anyone perceived to have cooperated with law enforcement. And Tereze Fenderson viciously enforced the street code in this case.

This retaliatory motive is aggravating for two reasons. First, this shooting further damaged an area already decimated by violent crime. And the Court can consider the demographic vulnerabilities of the areas impacted by the Defendant's misconduct to assess the need to deter future criminal conduct. United States v. Hill, 645 F.3d 900, 911-912 (7th Cir. 2011).

But second, and far worse, Fenderson purposefully undermined the rule of law by targeting someone he believed was cooperating with law enforcement. This conduct sent a chilling message to everyone else that they must endure the lawlessness or else they might find themselves or a family member personally targeted. This conduct also reinforced the perverse notion that people who talk to the police have done something wrong and can be punished through violence. This idea runs counter to how we maintain civilized society. This "exaggerated anti-snitching 'code of the street' weakens informal social control by stigmatizing residents who witness and report neighborhood crime, and simultaneously interferes with the system of formal social control that is necessary for crime prevention and community safety and justice for victims."[5] This is more than an attack on T.R., this shooting was

---

[5]     Woldoff, Rachael A., and Weiss, Karen G., "Stop Snitchin': Exploring Definitions of The Snitch and Implications for Urban Black Communities." In: Journal of Criminal Justice and Popular Culture 17(1) (2010), 184-223.

calculated to undermine law enforcement's ability to do its job, and as such it was an attack on the entire justice system.

<u>*Personal History and Characteristics of the Defendant*</u>:

Fenderson was a 37 year old man at the time the events began. He should have aged-out of this type of behavior long ago. But, this is his lifestyle.

It didn't have to be this way. He has five brothers and sisters who grew up in a similar environment, and four of the five are gainfully employed – including a sister who is a 22 year military veteran now serving as a pastor, and a brother who was enlisted in the Navy and who currently works in information technology.

It is also very aggravating that Fenderson was serving a sentence and was on federal pre-trial release *for a gun crime* at the time he shot T.R. And the shooting incident isn't the only recent bond violation. He was drug tested six times from September 20, 2017 – October 23, 2017, and he failed all six tests after using amphetamine, methamphetamine, and marijuana. It is clear that he has no regard for the legitimacy of the Court and its role in supervising his conduct. And that should not come as a surprise, as he was also on probation for distributing drugs (97-1422) when he was convicted of involuntary manslaughter in 2005.

Tereze Fenderson's presentence report offers an all-too familiar story line. As described in the introductory section, his life reflects unfortunate choices made against the backdrop of a crime-ridden and poverty-filled environment. While it may be within the district court's discretion to consider and credit these conditions in mitigation to some degree, the Seventh Circuit has repeatedly described such

considerations as "stock arguments" that, absent extraordinary circumstances, "do not meaningfully distinguish" one defendant from another and generally do not support a lesser sentence. See, e.g., United States v. Chapman, 694 F.3d 908, 916 (7th Cir. 2012) (sincere desire for treatment, deep remorse, history of gainful employment, and the support of family and friends are generic or "stock" arguments); United States v. Hall, 608 F.3d 340, 347 (7th Cir. 2010) (Never knowing his father and a history of youthful misbehavior do not meaningfully distinguish criminal defendants."); United States v. Grigsby, 692 F.3d 778, 791-92 (7th Cir. 2012) (arguments that defendant "overcame childhood abuse, was a first-time offender, and had a strong relationship with her children" were "stock arguments" that "have little to do with the defendant's culpability."); United States v. Russell, 662 F.3d 831 (7th Cir. 2011) (remorse, college education, job skills, age, marital status, and lack of drug abuse history "are neither remarkable nor so . . . extraordinary as to compel a lesser sentence" than the one imposed[.]"); United States v. Allday, 542 F.3d 571, 573-74 (7th Cir. 2008) (age, health problems, stable work history insufficient to justify below guideline sentence); United States v. Collins, 640 F.3d 265, 721 (7th Cir. 2011) (childhood trauma insufficient).

Nothing suggests that these "routine" personal characteristics are present to such a degree, either individually or in combination, to support a below-Guideline sentence.

(2) *§3553(a)(2):* need for the sentence imposed to accomplish each of the purposes of sentencing;

This provision of the sentencing statute codifies recognized theories of sentencing enabling the court to craft a sentence that is appropriate to each offender and each particular offense.

A. ***§3553(a)(2)(A): to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense***;

This sentencing factor is designed to consider punishment. Justice requires that any sentence be in proportion to the harm caused by a defendant's conduct. By any measure, Fenderson has caused great harm to T.R. and to his community. The integrity of the criminal justice system, itself, has been challenged in this case. All of these things occurred while the Defendant was on federal pre-trial release and serving a state sentence. Thus, a serious sentence is needed to promote respect for the law and to provide just punishment.

B. ***§3553(a)(2)(B): to afford adequate deterrence to criminal conduct***;

Deterrence is a utilitarian theory of sentencing that seeks to prevent both the defendant, and the general public, from making the choice to commit crime by ensuring that the costs of engaging in criminal conduct exceeds the benefit to potential offenders. Principles of specific (or individual) deterrence attempts to persuade the individual before the court not to commit further crimes. General deterrence, in its simplest form, discourages others who may be inclined to commit the same or similar offense.

Specific deterrence is obviously appropriate in this case. Fenderson has a long history dealing drugs and using firearms, and his prior sentences have been insufficient to stop that behavior. It is again noteworthy that Fenderson committed this offense while serving a sentence and while on bond because even the presence of court supervision was insufficient to deter serious criminal conduct.

Oftentimes courts are reluctant to rely upon general deterrence when sentencing. This case presents one of the rare situations when general deterrence should be a *primary* consideration. This Court should send a very clear message to others that retaliatory shootings will be dealt with in a very harsh manner.

C. ***§3553(a)(2)(C): to protect the public from further crimes of the defendant***;

This sentencing factor is philosophically different from deterrence and punishment. It considers incapacitation. While punishment ensures that the sentence is in proportion to the crime; and deterrence focuses on impacting people's choices about whether to commit an offense in the future; incapacitation, by contrast, prevents the offender from committing future crime by removing them from the society against which they have offended. This sentencing factor seeks to determine to what extent the defendant presents a current danger to the public.

Incapacitation is obviously appropriate in this case since the Defendant has already killed one man with a firearm and nearly killed a second.

D. **_§3553(a)(2)(D): to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner_**;

This final sentencing factor requires a sentencing court to consider the treatment needs of an offender. Traditional rehabilitative principles assume that the underlying causes of criminal conduct can be remedied through treatment so that the offender can be returned to society as a law-abiding member of the community. But interestingly, this section of the sentencing statute does not focus on rehabilitation as a sentencing theory because Congress explicitly "repudiated rehabilitation" as a theory of punishment, 18 U.S.C. § 3582(a), 28 U.S.C. §994(t). See United States v. Pinto, 857 F.2d 143 (7th Cir. 1989), 2 Fed.Sent.R. 56. As such, the Court's inquiry under §3553(a)(2)(D) is limited to addressing the treatment needs of the defendant.

To the extent that rehabilitative principles are appropriate for consideration, it is in within the context of §3553(a), which directs sentencing courts to impose a sentence that is "sufficient but not greater than necessary" to comply with the sentencing purposes set for in §3553(a)(2).

(3) _§3553(a)(3):_ kinds of sentences available to the Court;

Fenderson faces a minimum of 10 years up to life imprisonment in this case.

(4) *§3553(a)(4): the Sentencing Guidelines;*

| Guideline Section | Description | Level |
|---|---|---|
| | **Group 1**<br>**Count 1 (Felon in Possession, Feb. 5, 2016) and Count 3 (Retaliation, Oct. 22, 2017)** [6] | |
| §2K2.1(a)(2) | Base offense level [7] | 20 |
| §2K2.1(b)(6)(B) | Possessed in connection with another felony offense | +4 |
| §3C1.1 | Impeding the administration of justice | +2 |
| §3C1.3 | Commission of offense while on release, per §3147 | +3 |
| | | |
| | **TOTAL OFFENSE LEVEL** | 29 |
| | | |
| §3E1.1 | Acceptance of Responsibility | (- 3) |
| | **FINAL OFFENSE LEVEL:** | **26** |

For Group 1 (Counts 1 and 3) the Sentencing Guidelines call for Offense level 26, a Criminal History Category of IV, with a USSG imprisonment range of 92 to 115 months' imprisonment, a fine of $25,000 to $250,000, and a Supervised Release term of at least 5 years. However, for the conviction on Count 4, the Guidelines call for the minimum term of imprisonment required by the statute, which is an additional consecutive 120 months. USSG §2K2.4.

---

[6]   Counts 1 and 3 are grouped for Guideline calculation purposes because one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.

[7]   The base offense level is 20 because the two convictions for unlawful delivery of a controlled substance (97CF1433) do not count per §2K2.1 commentary note 10, which states: Prior Felony Convictions.- …. use only those felony convictions that receive criminal history points under §4A1.1(a), (b), or (c).

The involuntary manslaughter conviction (05CF93) received criminal history points, but is not considered a "crime of violence," as the Illinois statute is missing an element for the purposeful use or threatened use of physical force and is not an enumerated offense under §4B1.2(a)(2).

As such, the only qualifying conviction for the base offense level is unlawful possession with intent to deliver (15CF1095) (1 point), resulting in a BOL of 20.

Thus, pursuant to the Guidelines, Fenderson faces an imprisonment range of 212-235 months.

(5) *§3553(a)(5): relevant policy statements issued by the Sentencing Commission;*

Because of the grouping rules, many factors in this case that otherwise would have triggered specific offense characteristics are ignored in the Guideline computation. The most glaring omission is that Fenderson's participation in a drug conspiracy is not counted. Had the drug guideline applied, the sentence would have been increased to account for that conduct. The drug sentence would have been further enhanced because Fenderson's residence was fortified with steel bars and surveillance cameras. See USSG §2D1.1(b)(12).

It should be noted that despite three prior counts of conviction for drug trafficking and a conviction for involuntary manslaughter, Fenderson escapes treatment as either an armed career criminal or as a career offender. This results because of how the drug convictions are counted[8] and, ironically, because his involuntary manslaughter conviction for shooting a man in the head is not deemed a "crime of violence" or a "violent felony" under the applicable federal law.[9]

---

[8]   A serious drug offense is a state or federal narcotics crime carrying a maximum sentence of ten years or more. 18 U.S.C. § 924(e)(2)(A). His 2017 delivery charge is a Class 1 felony, so it is countable, but  his first two delivery offenses were Class 2 felonies, with a maximum range of imprisonment of 3-7 years under Illinois law. As such, they are not countable under the Armed Career Criminal Act (ACCA). His first two delivery convictions are also too old to be counted as Career Offender predicates. See USSG §4A1.2(e).

[9]   Involuntary manslaughter, as defined by Illinois law, is not a crime of violence for purposes of career offender guidelines, United States v. Woods, 576 F.3d 400 (7th Cir. 2009), and it is not a "violent felony" under the ACCA. United States v. Booker, 579 F.3d 835, 840 (7th Cir. 2009).

The USSG criminal history counting rules also ignore his oldest drug distribution counts, resulting in a four level reduction to the otherwise applicable base offense level for Counts 1 and 3. See, FN 7, p. 12.

And the Court should realize that Fenderson is also evading two separate five level (+5) sentencing enhancements that would otherwise apply to cases of witness retaliation, including the discharge of a firearm and causing serious bodily injury. See USSG §2A2.2(b)(2)(A) and §(b)(3)(B). Those enhancements do not apply because the grouping rules ignore the retaliation count since the felon in possession count carries a higher Offense Level.

Each of these otherwise applicable Guideline provisions reflects the Sentencing Commission's policy judgement that the identified conduct is particularly serious when the Court fashions an appropriate sentence. While these offense characteristics are ignored in the Guideline computation, they can, and should, be considered as sentencing factors under 18 U.S.C. § 3553(a)(5).

(6) *§3553(a)(6):* need to avoid unwarranted sentencing disparities among similarly situated defendants;

In Koon v. United States, 518 U.S. 81, 113, 116 S. Ct. 2035, 2053, 135 L. Ed. 2d 392 (1996), the Supreme Court explained, "The goal of the Sentencing Guidelines is, of course, to reduce unjustified disparities and so reach toward the evenhandedness and neutrality that are the distinguishing marks of any principled system of justice. In this respect, the Guidelines provide uniformity, predictability, and a degree of detachment lacking in our earlier system." While sentencing courts have been freed to reject the advisory Guideline ranges, it should be noted that the

Supreme Court continues strive for consistency, explaining that the "post-Booker federal sentencing scheme aims to achieve uniformity by ensuring that sentencing decisions are anchored by the Guidelines and that they remain a meaningful benchmark" from sentencing through the process of appellate review. Peugh v. United States, 133 S. Ct. 2072, 2083 (2013).

The most effective way to avoid unwarranted sentencing disparities is through the application of a sentence that falls within the Guidelines. As the Seventh Circuit has said, "we have repeatedly held that a within-guidelines sentence necessarily takes into account unwarranted disparities." See, e.g., United States v. Matthews, 701 F.3d 1199, 1205 (7th Cir.2012). This is because "the ranges are themselves designed to treat similar offenders similarly." United States v. Boscarino, 437 F.3d 634, 638 (7th Cir. 2006). Indeed, we have noted that imposing a within-guidelines sentence is the surest way to avoid unwarranted disparities. United States v. Babul, 476 F.3d 498, 501–02 (7th Cir. 2007); United States v. White, 737 F.3d 1121, 1145 (7th Cir. 2013).

(7) *§3553(a)(7):* need to provide restitution to the victims.

Restitution is unlikely to be paid in this case based upon the financial circumstances described in the presentence report.

## IV.    COMMISSION OF OFFENSE WHILE ON BOND

18 U.S.C. § 3147(1) provides that if a person is convicted of an offense while on pretrial release, then in addition to the sentence for the underlying felony offense,

the person should be sentenced to an additional term of up to 10 years. Section 3147 is a sentencing enhancement and not a separate crime.

Section 3147 provides, without exception, that a defendant such as Fenderson "convicted of an offense committed while released under this chapter [Chapter 207] shall be subject to an additional punishment of no more than 10 years." Thus, the section increases the statutory maximum, however, Fenderson is already facing the possibility of a life sentence based upon his conviction for 18 U.S.C. § 924(c).

USSG §3C1.3 (Application Note 1) provides, "Under 18 U.S.C. § 3147, a sentence of imprisonment must be imposed *in addition to* the sentence for the underlying offense, and the sentence of imprisonment imposed under 18 U.S.C. § 3147 must run consecutively to any other sentence of imprisonment. Therefore, the court, in order to comply with the statute, should divide the sentence on the judgment form between the sentence attributable to the underlying offense and the sentence attributable to the enhancement." So, the amount of the sentence attributable solely to the sentencing enhancement must run consecutively to any other sentence. United States v. Young, 62 F. App'x 640, 642–43 (7th Cir. 2003).

## V.   CONDITIONS OF SUPERVISED RELEASE:

The Government has reviewed the proposed supervised release terms and agrees with the Probation Officer's recommendations.

VI.   **CONCLUSION**

What is the appropriate punishment for a drug dealer who guns down an old friend believed to be a federal cooperating witness? How much time should be added to the sentence after realizing that this gunman was previously convicted for involuntary manslaughter for shooting and killing another man in 2005? And lastly, how much more aggravating is the situation because the shooter was on pre-trial release for another gun crime and was serving a state probationary sentence at the time of the offenses? These rhetorical questions illustrate that a very serious sentence must be imposed in this case.

The violent crime epidemic terrorizes a number of communities in the Southern District of Illinois. But none are hit harder than East St. Louis. This premeditated attack occurred close to a bar where dozens of people were present – and who were videotaped running for safety when the shots rang out. This brazen conduct must not be tolerated.

The parties agreed to recommend a sentence within the applicable Guideline range, as determined by the Court. The United States recommends a sentence at the highest end of the applicable range. As set forth more fully on pages 15-16, the Guideline computation resulted in a relatively generous applicable sentencing range when considering the offense conduct omitted from the Guideline calculation because of the grouping rules. No further leniency is due.

A sentence at the highest end of the applicable Guideline range is nearly 20 years, which is sufficient, but not greater than necessary, to serve the sentencing

purposes set forth in 18 U.S.C. § 3553(a). Such a sentence would also account for the other mitigating factors present in the case – including the important fact that he accepted responsibility and admitted his offense conduct. Because Fenderson is significantly older than most violent offenders, a sentence within the applicable Guideline range will result in his release at a time in his life when his risk to the community should be substantially reduced.

VII.   **GOVERNMENT'S RECOMMENDATION:**

    A. **Imprisonment:** High end of the applicable Guideline range, which is 235 months, apportioned as follows:

- Count 1 and Count 3 – A concurrent term of 115 months total punishment. The sentence should be structured with 103 months apportioned to Count 1 and Count 3, which should be served consecutively to an additional 12 months, pursuant to 18 USC §3147.

- Count 4 – An additional 120 months imprisonment, to be served consecutively to Counts 1 and 3.

    B. **Fine:** $5,000

    C. **Duration of Supervised Release:** Five years.

    D. **Special Assessment:** $300

    E. **Restitution:** As determined by the Court.

Respectfully submitted,

STEVEN D. WEINHOEFT
United States Attorney

s/ Steven D. Weinhoeft

Nine Executive Drive

Fairview Heights, Illinois 62208
(618) 628-3700 telephone
(618) 628-3720 facsimile
E-mail:  Steven.Weinhoeft@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| TEREZE L. FENDERSON, | ) |
| | ) |
| Defendant. | ) |

CRIMINAL NO.  3:17-cr-30090-MJR

## **CERTIFICATE OF SERVICE**

I hereby certify that on **February 20, 2019,** I caused to be electronically filed GOVERNMENT'S SENTENCING MEMORANDUM with the Clerk of Court using the CM/ECF system which will send notification of such filing to all attorneys of record.

Respectfully submitted,

STEVEN D. WEINHOEFT
United States Attorney

*s/ Steven D. Weinhoeft*

Nine Executive Drive
Fairview Heights, Illinois 62208
(618) 628-3700 telephone
(618) 628-3720 facsimile
E-mail:  Steven.Weinhoeft@usdoj.gov