UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

UNITED STATES of AMERICA     )      17-30090
                             )
                             )
             Plaintiffs,     )
                             )
        Vs.                  )      East St. Louis, Illinois
                             )      March 7, 2019
TEREZE L. FENDERSON,         )
                             )
             Defendants,     )

TRANSCRIPT OF DISPOSITION
BEFORE THE HONORABLE MICHAEL J. REAGAN,
UNITED STATES DISTRICT JUDGE.

APPEARANCES:

For the Plaintiffs:       Assistant U. S. Attorney
                          By:  Amanda Fischer
                          Nine Executive Drive
                          Fairview Heights, Illinois  62298

For the Defendants:       Frank, Juengel & Radefeld
                          By:  Daniel A. Juengel
                          7710 Carondelet Avenue
                          Clayton, MO  63105

Court Reporter:           Barbara Kniepmann
                          750 Missouri Avenue
                          East St. Louis, IL  62202

Proceedings recorded by mechanical stenography, transcript
produced by computer.

1      (Whereupon the following proceedings were held in open

2  Court.)

3           THE COURT:  Good afternoon all.  Please be seated.

4           The United States of America against Tereze L.

5  Fenderson, 17-30090, set this afternoon for sentencing, the

6  defendant having pled guilty to a single count of being a

7  felon in possession, single count of attempting to retaliate

8  against a witness, and a single count of discharging a firearm

9  in connection with a crime of violence.  Those are Counts 1, 3

10  and 4 respectively.

11          My understanding is at the conclusion of the

12  proceedings the Government will move to dismiss with prejudice

13  Counts 2 and 5.

14          Miss Fischer is here for the United States.  Miss

15  Fischer, good afternoon.

16          MS. FISCHER:  Good afternoon.

17          THE COURT:  Mr. Juengel is here for the defendant.

18  Good afternoon.

19          MR. JUENGEL:  Good afternoon, Your Honor.

20          THE COURT:  And Mr. Fenderson, good afternoon.

21          The Government filed a Sentencing Memorandum in this

22  matter at Document 92, defense counsel at Document 91.  The

23  current iteration of the Presentence Report is at Document 97.

24          I have received letters in support of the defendant.

25  All have been electronically filed.  I do have one that may

1  not have been.  I am not sure.  It is from Wanda Keefe

2  Henderson.  I have reviewed that.  I can't tell if it was

3  filed or not, but I do have it.

4       MR. JUENGEL:  It should have been electronically

5  filed.

6       THE COURT:  All of the other ones I have, have been

7  stamped at the top.  This one doesn't.

8       No objections have been filed to the Presentence

9  Report by either side.

10       Mr. Fenderson, your Presentence Report in this case

11  is at Document 97 in our electronic filing system.  It is 37

12  pages and 173 numbered paragraphs in length.  Have you gone

13  over the report in detail with your lawyer?

14       MR. FENDERSON:  Yes, sir.

15       THE COURT:  Is everything in it true, correct and

16  accurate?

17       MR. FENDERSON:  Yes, sir.

18       THE COURT:  Okay.  The Court accepts the Presentence

19  Investigation Report in its current form and adopts the

20  factual findings therein.

21       MR. JUENGEL:  The only thing we did do, the defense

22  did file an objection.  It didn't have anything to do with the

23  calculations, but we did object to the paragraph dealing with

24  charges and conduct that the defendant wasn't convicted of.

25  So that was the only objection.  It didn't have any dealing

1  with the calculation, but I can incorporate that into my

2  arguments.

3          THE COURT:  I can explain to you, and thank you, I

4  missed that.  Probably overlooked it because it is my habit to

5  not consider uncharged conduct, conduct that resulted in a not

6  guilty finding.  So when I get to that section of the PSR, and

7  I am going to look at it now for the first time just to give

8  you the title of it.  Other arrests starting at paragraph 80.

9  I don't read that.  I have been probably the subject of some

10  criticism by the United States for not doing that.  My

11  jurisprudence is just because it is charged doesn't mean it is

12  accurate and doesn't mean the defendant should be punished as

13  a result of it.  So if there is no admission, no plea, no

14  conviction, I don't consider it.

15          MR. YOUNGMAN:  That would be fine, Your Honor.  That

16  is the main reason we wanted to make the objection.

17          THE COURT:  Okay, sure.  Under the statute, Count 1

18  has a potential penalty of up to ten years incarceration,

19  felon in possession of firearm charge.  Count 3, which is the

20  attempting to retaliate against a witness, has a potential

21  penalty of up to ten years incarceration.  Count 4, which is

22  discharging a firearm in connection with a crime of violence,

23  has a potential penalty of 120 months minimum to life, and

24  Count 3 or Count 4, and not both of them, are subject to a

25  potential enhanced penalty under Section 3147 as a result of

an offense being committed while the defendant is on pre-trial release.

Supervised release on Counts 1 and 3 under the Statute is up to three years, Count 4 up to five years.  No eligibility for probation under the statute.

Potential fine on each of Counts 1, 3, 4, up to $250,000 per count.  Restitution is to be determined.  There is a special assessment of $300 consisting of $100 per count, and there is a forfeiture of a Taurus PT92AF 9mm semiautomatic pistol with the serial number ending in the numerals 995 along with any and all ammunition contained therein.

Under the advisory United States Sentencing Guidelines, given a total offense level of 26 and criminal history category of four based upon eight points, the guidelines suggest as to Counts 1 and 3 a range of 92 to 115 months, Count 4, 120 months consecutive to all other counts.  Again, an enhanced penalty under 3147 as to either Counts 3 or 4, but not both.

Under the guidelines, supervised release suggested at one to three years, Count 4, two to five years.  I make the same conclusion as to probation, restitution, special assessment and forfeiture under the guidelines that I made as to the statute.

The guideline fine range, again, advisory as the guidelines are, as to each count is $25,000 or the total for

1   all three counts would be $25,000 to $250,000.

2        Miss Fischer, do you object to any of the

3   conclusions?

4        MS. FISCHER:  No, Your Honor.

5        THE COURT:  Mr. Juengel?

6        MR. JUENGEL:  No, Your Honor.

7        THE COURT:  At this time I recognize the United

8   States for your recommendation with respect to sentencing.

9        Before you get there, I had sent both of you an

10  e-mail earlier today about crafting a potential judgment as to

11  what I am looking at based upon low end guideline range and

12  high end guideline range.  The reason I did that is because

13  the guideline range in this case as I calculate it is 212 to

14  235 months, okay?  Does the Government agree with that?

15       MS. FISCHER:  Yes, Your Honor.

16       THE COURT:  Mr. Juengel, do you agree with that?

17       MR. JUENGEL:  Yes, Your Honor.

18       THE COURT:  The question is how do you get to that

19  because Count 4 is consecutive.  The enhancement under 3147 is

20  not a separate count, but it is an enhancement that has to run

21  consecutive.  My thinking on this is that when the Government

22  added that, charged that enhancement as to Count 3 and 4 -- I

23  don't think you can do that.  I think it has to be one or the

24  other.  Here is the reason.  That enhancement occurs because

25  the defendant committed an offense while on pre-trial release.

1    There is only one order the defendant violated, okay?  You

2    can't add the enhancement to the two separate offenses that

3    violated the one order because you would be double counting.

4    Let's say he committed a thousand offenses.  We wouldn't have

5    a thousand enhancements.  My thinking is the enhancement needs

6    to run consecutive to either Counts 3 or 4, but not both, to

7    avoid double counting.  That is my first point.

8            Second point is the way I did this, I did it in

9    steps.  The first thing I did was figured out group number

10   one.  Step number one is the grouping.  That is the felon in

11   possession of Count 1, retaliation of Count 3 and under the

12   guidelines that gives you 26 as a total offense level and

13   Category 4 for 92 to 115 months.  Then on top of that you have

14   Count 4, which has to run consecutive and that is 120 months

15   to life.  That is step two.

16           Then step three is factoring in this enhancement on

17   either Counts 3 or 4, arbitrarily figuring Count 3.  That is

18   kind of how I approached it.  The reason I e-mailed you is to

19   see if you had any alternate thinking in terms of what I am

20   thinking.  That is how it goes.  That is the background.

21           Miss Fischer?

22           MS. FISCHER:  If it is okay with the Court, I think

23   I'll address that issue first as to the actual sentencing

24   allocation.  When I looked into the guidelines of the 3147

25   enhancement, those are found in 3C1.3.  It specifies that it

1  would increase the base offense level by three levels, which

2  is accounted for in the total offense level of 26 that we

3  have.  Then what the Court should do is take the total

4  guideline range and allocate a portion of it, not increase it,

5  but allocate a portion of that to the fact that this was done

6  on release and the remainder to the actual offense itself.  In

7  my sort of brief case law search of this, I think the only

8  restriction on the Court is that you would need to figure the

9  base offense level without that enhancement being in place.

10  So if we took out the three level enhancement, it would put

11  him at a range, instead of 92 to 115, at 70 to 87.  So I think

12  so long as you allocate it so the base offense level for the

13  crime itself, you are allocating at least 70 to 87 months, I

14  think we're covered under the law because any amount

15  additional to that could be allocated then to the fact that he

16  was on release.  So in the Sentencing Memorandum filed by the

17  U.S. Attorney in this case, he suggested a 12-month allocation

18  to the actual fact that it was done while on release.  He

19  suggested 103 months as to the offense itself and an

20  additional 12 months for a total of 115 months.  That is what

21  I would advocate today.  I don't think the 12 months is

22  required under the law.

23          THE COURT:  It can be anywhere up to ten, right?

24          MS. FISCHER:  Right.  So that's what we would

25  suggest.

1          THE COURT:  He seemed to allocate to both Counts 3

2  and 4.  I don't think I can do that.

3          MS. FISCHER:  I think you are absolutely correct.

4  When I looked into the guidelines for the 924(C) enhancement

5  found in 2K2.4, it specifies that Chapter 3 and 4 enhancements

6  do not apply to that guideline range and because it is a

7  Chapter 3 enhancement, I don't think we could apply it anyway.

8  I think it is perfectly appropriate to apply it to 3, which is

9  unusual since 3 is grouped with 1, but I think that is what we

10  have to do is apply it to that grouping and not to 4.  So we

11  would advocate for a total sentence of 235 months today.  That

12  would be allocated as set forth in the Sentencing Memorandum

13  with 103 months for the offense itself contained in Counts 1

14  and 3, 12 months under 18, U.S.C. Section 3147 and 120 months

15  as to Count 4, all to be served consecutively to each other.

16          THE COURT:  1 and 3 would be concurrent with each

17  other.  Anything else?

18          MS. FISCHER:  Yes.  Just so that the offense level

19  and the 3147 would be consecutive and the 120 months would be

20  consecutive.  I think we have to set that forth specifically

21  in the judgment.

22          THE COURT:  Right.  At this point in time do you

23  agree what you just said is a top end guideline sentence.

24          MS. FISCHER:  I do, Your Honor, yes.

25          THE COURT:  Mr. Juengel, I'm going to ask you what

1    you think a bottom guideline sentence would be.

2           MR. JUENEL:  Well, I think if we all agree, if we

3    could just subtract -- you know, it's a 24 month difference

4    between the top end and the bottom end.  So we would just need

5    to subtract it off.  I think the Court -- the way they have

6    it, they have it listed as this 12 months and 115 months, but,

7    you know, if the sentence was -- the minimum was the 70 to

8    87 months, I think the Court could just take from the 92 to

9    115, could just take it off of that if the Court wanted to do

10   it.  That might be easier than to make it --

11          THE COURT:  I don't think it works that way.  Here is

12   the way I calculate that.  Maybe we can agree on what the

13   minimum guideline sentence would be.  I come up with a minimum

14   guideline sentence of 80 months on Counts 1 and 3 concurrent.

15   And then in using the same numbers, 12 months on Count 3 on

16   top of that allocated as the 3147 enhancement, 121 months for

17   Count 4 consecutive.  You add all that up and you get

18   212 months.

19          MS. FISCHER:  I would agree with that, Your Honor.

20          THE COURT:  For some reason -- I tried it.  You just

21   can't take the top end of the guideline and then subtract to

22   get to low end.  It just doesn't work.

23          MR. JUENGEL:  Makes sense to me, Your Honor.  I'm

24   sure you were better in math class.

25          THE COURT:  I'm a lawyer.  I am not a doctor because

1    I didn't know math.

2        MR. JUENGEL:  Same thing here.  Our goal is just

3    whatever math has to be done to try to get there.  We're bound

4    by the plea agreement to argue.  Lowest we can go is low end.

5        THE COURT:  Which is why I wanted to set the

6    parameters in my e-mail.  You tell me what you think the low

7    end is.  Miss Fischer, do you agree the low end would be the

8    212 months?

9        MS. FISCHER:  Yes, Your Honor.

10        THE COURT:  I will not interrupt you anymore.  I have

11    to fashion the judgment and come up with a wording the BOP

12    understands so he gets no more time than I want to give him

13    and no less time than I want to give him.

14        MR. JUENGEL:  Got you.  That seems more than

15    reasonable.

16        THE COURT:  Miss Fischer?

17        MS. FISCHER:  Thank you, Your Honor.  So looking

18    within the range of 212 to 235 months, we would be

19    respectfully requesting a sentence of 235 months, which is the

20    high end of the guideline range in this case, followed by five

21    years supervised release.  Now, obviously, as the Court is

22    aware from reading the Sentencing Memorandum filed by the U.S.

23    Attorney, it is quite extensive.  I will try to hit the high

24    points briefly today in this argument.

25        Looking at the nature and circumstances of this case,

what really stands out from reviewing the underlying incidents

that happened is that we're looking at an extremely high level

of disregard for the law and for human life, but an unusually

high disregard of the law.  This defendant, first in Count 1,

had a gun in his house, a gun he was clearly not allowed to

have given that he had a prior felony conviction.  It wasn't

just any prior felony conviction.  It was a felony conviction

for taking the life of someone else with a gun.  That is the

very type of defendant that we do not want to have a gun

again.  He did have a gun in his house.  It is someone who has

shown by that history that he is clearly not up to being

tasked with the responsibility of safely and responsibly

having the gun, but he had that gun and he disregarded the law

in doing so.

Then as this Court knows, he was charged with that

offense and released on bond.  While on bond in this Court,

knowing that he was facing a serious sentence for having a gun

that he was not allowed to have, he got another gun knowing

that he was on bond for a gun offense and this time he didn't

just have the gun in his house, he used that gun.  He used

that gun to literally hunt down someone that he considered to

be a friend in the past in the middle of the street like an

animal and shoot him repeatedly.

Why did he shoot down that friend?  Because he

believed that that person was cooperating with law enforcement

1   and giving information against him.  So in an attempt to get

2   revenge for that behavior, he essentially was undermining the

3   justice system and undermining the integrity of the

4   proceedings against him by trying to take the law in his own

5   hands and take care of that witness outside of the scope of

6   the criminal justice system.  In order to enforce that street

7   code that he thought was appropriate, he was willing to take a

8   life with that gun.

9        And what is concerning is that this type of behavior

10  is not out of character for the defendant when you look at his

11  history.  We know he was out on release for a gun count and

12  gun charge when he had this gun.  He knew that he could not

13  have that gun and he certainly knew he could not use it to

14  shoot someone.  He was also on probation for a state charge

15  for possession with the intent to deliver cannabis.  Even

16  while on probation and on release in this case, he had a gun

17  again.  And knowing that he had already taken a life with a

18  gun before and in that case at the time that he was convicted

19  of that, when he committed that offense, he was already on

20  probation for another drug distribution charge.

21       So he has clearly shown a history he does not believe

22  the law applies to him.  He does not believe he has to follow

23  the rules of any Court, and he has shown that in order to

24  accomplish whatever goals he may have at the time, he is

25  willing to disregard the law and disregard whatever human life

1    may get in the way.

2          Now, Your Honor, we also have to look at the need for

3    the sentence to reflect the seriousness of the offense and in

4    this case we have a very serious offense. Obviously, the

5    victim in this case suffered very serious physical harm. He

6    just went through his fourth surgery, but he has also suffered

7    very tremendous emotional harm, emotional harm from being

8    essentially hunted by someone that was once his friend. It

9    is, as I said, it is a larger crime than that. It is a crime

10    against the justice system itself because he is essentially

11    trying to enforce this street code that you will be punished

12    and you will face consequences if you cooperate with law

13    enforcement. How many murders and violent crimes do we have

14    that go unsolved in East St. Louis because people who may be

15    completely innocent don't want to cooperate with law

16    enforcement and don't want to give information to law

17    enforcement because of this very fear that someone will

18    retaliate against them. They are afraid of people like this

19    defendant. This defendant has shown that he does not respect

20    the law and the only way to deal with that is with a harsh

21    punishment here.

22          Looking then to deterrence. We know this defendant

23    clearly needs to be specifically deterred from engaging in

24    this type of conduct. The punishments he has had in the past

25    have not worked. He has not had a serious sentence more than

1  a couple of years in the past and he needs to be shown that

2  his behavior will not be tolerated.  But we also need to send

3  a message this type of behavior and these sorts of anti

4  snitching norms that are pervading society in East St. Louis

5  need to be stopped, that that is not the type of behavior that

6  is acceptable and this type of retaliation will not be

7  tolerated.

8          Your Honor, finally, I want to draw the attention

9  just to the need to avoid unwarranted sentencing disparities.

10  Obviously, this is a very serious case, but we believe that

11  the best way to avoid any sentencing disparities is to impose

12  a guideline sentence.  I think because it is such a serious

13  case, and I am trying to be very brief because of the

14  extensive nature of the sentencing memorandum, but he is very

15  deserving of the high end of that guideline range.  It is well

16  supported by the 3553(a) factors.

17          But when the parties negotiated this plea agreement,

18  it was contemplated and viewed as a mitigating factor the

19  victim was not going to be retraumatized by going through the

20  Court process, that there was an appeal waiver in place, both

21  of which have great value to the Government.  For those

22  reasons we would advocate a guideline sentence.  We think it

23  is important to impose that in this case, but we would

24  strongly recommend a high end guideline sentence, which in

25  this case would be 235 months, allocated as we previously set

1  forth.

2        THE COURT:  Miss Fischer, couple of questions,

3  please.  From my review of the file it looks as though with

4  respect to the victim, TR, there were a total of 14 shots at

5  him.

6        MS. FISCHER:  I believe that's correct.

7        THE COURT:  Four came from a 9mm that was associated

8  with Mr. Fenderson, ten from the other individual.

9        MS. FISCHER:  That's correct.

10        THE COURT:  Do we know which ones struck the victim?

11        MS. FISCHER:  May I have one moment, Your Honor?

12  Your Honor, in consultation with the case agent, I do not

13  believe that any projectiles were able to be recovered to do

14  any sort of matching to determine which ones came from which

15  gun.

16        THE COURT:  Which I assume is why you charged him

17  with attempted retaliation as opposed to actual retaliation?

18        MS. FISCHER:  I believe that's correct.

19        THE COURT:  Okay, understood.  Mr. Juengel?

20        MR. JUENGEL:  Thank you, Your Honor.  With respect to

21  the facts and circumstances of this case, and I think when

22  Tereze addresses the Court he will tell the Court that there

23  is no excuse for his behavior.  He has come into Court, pled

24  guilty, admitted to the offenses and taken responsibility for

25  that.  Those offenses are very serious.  I am not going to try

1   to gloss over that in any sense of the word, Your Honor, but

2   also I would say that the guideline range that we're looking

3   at is a very serious guideline range.  I mean 212 to 235,

4   where it is about a two year difference I guess within the

5   discretion for the parties to argue.

6           He has asked me and his family asked me to request a

7   sentence at the low end of the guidelines, but we also concur

8   with the Government in asking the Court, respectfully, to give

9   a guideline sentence in this particular case because of a lot

10  of factors with respect to this situation.

11          I submitted a Sentencing Memorandum with a number of

12  letters on behalf of Mr. Fenderson.  It was more of trying to

13  give the Court some insight as to who Tereze is.  I mean the

14  Court sees his criminal record, which is problematic, I would

15  agree.  The Court sees the offense conduct, which is

16  unacceptable, but we really are trying to figure out, well,

17  why is Tereze here and how did this guy get to this level, how

18  did it arise.  I tried to lay out the history of his life and

19  his environment and a lot of those things.  The Government

20  laid out that he made bad choices.  I agree he made bad

21  choices, but the environment he was born into, the

22  neighborhood he grew up in, when you are witnessing violence

23  and drug dealing and that is the way of life that you are

24  raised in, that is the norm that people are shot.

25  Mr. Fenderson was shot multiple times and I understand why

1 somebody would carry a gun. It is illegal and he has to deal

2 with the consequences of that.

3 Now that doesn't give him justification to go out and

4 shoot someone, to go out and shoot an individual that for

5 years was his friend, a very good friend and a younger

6 individual, but he thought of him kind of as a younger nephew

7 or younger son.

8 One of the things that I think the Court has to

9 address in the sentencing in this case as the statute lays out

10 is there is deterrence aspects, there is incapacitation

11 aspects, there is punishment for the nature and circumstances

12 of the crime, but also taking into consideration the

13 individual's characteristics, things that his family said

14 about him and what I would say is on paper if you look at just

15 the crime, look at his record that looks really, really bad,

16 but his family laid out another side for the Court, how he

17 takes care of his kids, how all of his children have -- the

18 adult children have graduated from high school and they are

19 all working. He wants to do things better for his kids. He

20 wants his kids to not make the same mistakes that he keeps

21 making and he wants to try to be involved in their lives as

22 much as possible while he is in the BOP serving his sentence.

23 So I would ask the Court to consider some of the redeeming

24 qualities that he has from his family, that they have laid out

25 on his behalf, some of the charity work he has done. He has

1 tried to give things to family members and he has got a part

2 of him that has a good natured heart and good side.

3        Then there is this other bad side that the criminal

4 justice system is going to deal with here today.  We would ask

5 the Court to consider balancing that and to consider giving

6 him the low end of the guideline based on the positive aspects

7 that would have played out in his Sentencing Memorandum.

8        The other thing that he would request, Your Honor, he

9 would like to do a residential drug treatment program in the

10 BOP if he goes there.  He has had a history of drug usage and

11 that would be helpful.  He would also ask the Court to

12 consider incarcerating him in a facility as close to the East

13 St. Louis area as possible.  I think you had a specific -- was

14 it Marion that you wanted me to specifically?

15        MR. FENDERSON:  Marion or Greenville.

16        MR. JUENGEL:  I don't know if he would qualify for

17 Greenville based on security levels or anything like that, but

18 if Greenville was an option or Marion was a potential option,

19 because his family, local family, is of limited means.

20        The other thing that I thought supported some of the

21 arguments that I am making is when I looked at his family and

22 some of his siblings on his father's side that moved away,

23 those individuals were successful, didn't have criminal

24 records.  So I would submit to the Court that this environment

25 of East St. Louis and the environment that he was raised in

1    did have a lot to do with why we're here ultimately today.

2         Then I do know that Mr. Fenderson does want to make a

3    statement.  I would note for the Court that his family thinks

4    highly of him.  Everyone here -- I think almost everyone here

5    in the back are members of his --

6         THE COURT:  Except for the Marshal Service.  This is

7    the only case I have this afternoon, so I know everyone here

8    is here for him.

9         MR. JUENGEL:  -- are members of his family and they

10   thought highly enough of him to write letters on his behalf

11   and to come to Court on his behalf.  I think the letters -- if

12   you read the letters, Your Honor, and I know the Court did,

13   they don't -- they understand what he did was wrong.  They

14   understand that.  They are thankful that he is not here on a

15   -- or I think one letter said that she is glad she is not

16   writing a poem for an obituary column, because that could be,

17   based on his lifestyle, what is happening here.  I think they

18   are thankful that he is in a position where he can hopefully

19   have some sort of future based on the Court's sentence, but

20   the Court makes the final call on all of that.

21        I appreciate you listening to my arguments and

22   reading all of the information that we presented to the Court

23   and then I do think Mr. Fenderson does want to make a brief

24   statement to the Court.

25        THE COURT:  Okay.  Before I hear from him, there are

1  two points I want to make.  First of all, I am happy to

2  recommend either FCI Greenville or Marion.  My experience has

3  been, given this type of criminal history, he might not get

4  there.  If we want to increase his chances, I would ask if you

5  would fill out the BP 337 form.  Are you familiar with that?

6          MR. JUENGEL:  I can find it, Your Honor.  I am not.

7          THE COURT:  You go to BOP.gov and go to forms and go

8  to BP 337.  That is the form that the Bureau of Prisons uses

9  to determine the classifications of an individual.  You will

10  look at criminal history, at this offense.  It considers all

11  kinds of things.  You will come up with a total point level.

12  Then you can compare that to what an institution has in terms

13  of where you can go with those number of points.  If you

14  determine that, yes, he qualifies for FCI Greenville, for

15  example, I will put in the judgment that I recommend FCI

16  Greenville and we believe that based upon a calculation under

17  BP 337 he qualifies.  My experience has been there is a

18  greater chance at getting him there than if you don't do that,

19  and I'll pay you to do it.  The only thing I ask is if you can

20  get it to me within a week.  I don't like to sit on judgments.

21  He will sit in the local county jail until I enter judgment.

22  I want to get him in the Federal facility where there is

23  education, better medical facilities, whatever.  I ask that

24  you do it ASAP.  All you need to do is call Reid and say hey,

25  he qualifies or doesn't qualify.  I'll make the

1  recommendation.

2        MR. JUENGEL:  If he doesn't qualify, can I have leave

3  to -- I can probably reach Mr. Fenderson by phone and talk to

4  him about some other facilities.  Could I supplement the

5  request?

6        THE COURT:  All you have to do is call.  You can do

7  that ex parte.

8        MR. JUENGEL:  Thank you, Your Honor.

9        THE COURT:  The second point is restitution.  Before

10  I hear from Mr. Fenderson, why don't we hear from the

11  Government first and then defense counsel.  I see there is an

12  exhibit.  Government Exhibit 1 has been provided to me.  Any

13  objection to me considering Exhibit 1, Mr. Juengel?

14        MR. JUENGEL:  The Government told me they have a

15  witness to lay the foundation.  We don't have an objection to

16  you considering that.  We may have some dispute with respect

17  to the income because of the nature of how it was calculated,

18  but we don't have a dispute to the medical aspect of it.

19  There is a medical portion of that restitution request.  I may

20  just make a verbal objection to the other arguments after the

21  Government has made their argument.

22        THE COURT:  Let's hear what the Government has to

23  say.

24        MS. FISCHER:  Thank you, Your Honor.  What you should

25  have in front of you are Government Exhibits 1 through 5

1    together as a packet.

2           Government Exhibit 1, for the record, is a

3    declaration of victim loss, which is a sworn statement by the

4    victim setting forth what he believes his losses are from this

5    case.  It is, I would submit, not a comprehensive statement of

6    all of the losses he has had, but it is something he was able

7    to put together with documents that he had on hand and the

8    best accounting that he could come up with.

9           So what is contained in Government Exhibits 2 through

10   5 are the documentation we have to support those.  We don't

11   have documentation to support all of the amount other than the

12   victims' sworn statement, which I do believe is sufficient

13   under the law as long as the Court would find there is a

14   sufficient basis for the amount and it is not too conclusory.

15   Basically, the victim would set forth he lost his job as a

16   result of the injuries he faced.  He was unable to work.  He

17   was unable to get out of bed for a lengthy amount of time and

18   had to undergo numerous surgeries.  He estimated he was

19   working at $300 a week doing mechanic's work prior to his

20   injury and he sets forth the date range that he was unable to

21   work as being October 27th of 2017 to August 21st of 2018.  So

22   we calculated the number of weeks on that, which I believe was

23   42 weeks at $300 a week as part of his lost wages.

24           In Government Exhibit 2, this is a bill for his most

25   recent surgery.  He is not insured.  There is a discount that

1  reflects it is a cash payment, so this is the bill that he

2  received most recently for his fourth surgery.  That is in the

3  amount of $7,926.49.

4       Government Exhibits 3, 4, 5 are recent paychecks that

5  he has from his current job.  The reason that we included

6  those is because he sets forth in his declaration that he was

7  out of work for approximately four weeks for his most recent

8  surgery and he makes, on average, $250 a week.  As you can

9  see, it is not exactly 250.  He works slightly different hours

10  each week, but it was meant to show the Court at least a

11  sampling of what he is currently making.  So we calculated all

12  of those amounts and after adding them up we came up with the

13  figure of $21,526.

14       I do also have an original unredacted version of the

15  victims' declaration if the Court would like it for its

16  records.

17       THE COURT:  No, but what I would like is what is the

18  figure, if we take out the October 27th of 2017 to August 21st

19  of 2018 wage claim, and the reason I say that is I don't have

20  any substantiation for that.  I don't have any paycheck stubs.

21  You've given me substantiation for the medical and the current

22  wage loss, but the past stuff -- And this guy was a drug

23  dealer, okay.  He doesn't have the credibility I am typically

24  accustomed to giving in lost wages.  I am inclined to give

25  everything except that.

1          MS. FISCHER:  We would be left with $7,926 medical

2    bill plus the four weeks at approximately $250.

3          THE COURT:  Okay.  Mr. Juengel?

4          MR. JUENGEL:  Your Honor, that is where you were

5    going is exactly what our analysis was.  We don't have an

6    objection to the medical.  We also don't have an objection to

7    the section that shows his paycheck stubs, but, unfortunately,

8    Mr. Fenderson and this man were -- they were dealing drugs and

9    so we would object to the other undocumented.  It would be

10   $8,926 that we would not have an objection to if the Court

11   entered an order of restitution in that amount.

12         THE COURT:  That is what I intend to do.  Thank you.

13         Mr. Fenderson, come on up here.  You been on my

14   docket a long time, right?

15         MR. FENDERSON:  Yes, sir.

16         THE COURT:  How long you been in jail this time?

17         MR. FENDERSON:  I believe 16 months now.

18         THE COURT:  Yeah.  I mean we had stops and starts and

19   stops and starts.  Why don't you just start by telling me -- I

20   don't want you to introduce everybody, but tell me generally

21   who is in the back here.

22         MR. FENDERSON:  Daughter, nieces, nephews, friends,

23   sisters, stepfather, mother, baby mother.

24         THE COURT:  The whole group.

25         MR. FENDERSON:  Yeah.  Grandchildren, cousins.

1     THE COURT:  Okay.  Basically everybody in your

2  personal world?

3     MR. FENDERSON:  Yes, sir.

4     THE COURT:  Okay, good, everyone in your personal

5  world.

6     MR. FENDERSON:  First and foremost, I would like to

7  apologize to Tory Richardson and his family for the bodily

8  harm and pain and suffering that he has suffered due to the

9  harmful actions that were brought upon him on the night of

10  October 22nd of 2017.  I would like to say with all respect

11  and honesty that I am truly sorry to Tory and his family.  I

12  also would like to apologize to my family and the entire

13  community of East St. Louis as well.  I want to say not only

14  has my actions affected Tory and his life, but it also has

15  affected the life of me and my family as well.  It has

16  destroyed all of our lives tremendously, all parties.  It has

17  destroyed the relationship with my mother, children, siblings

18  and fiance.  It also has added negativity to the already self

19  destructive lives and poverty of our community.  I understand

20  my actions are not tolerated and is not accepted in any form

21  or fashion whatsoever.

22     I am here today to accept full responsibility for my

23  actions and participation in this crime that was committed

24  against Tory that I am very sorry for.  I truly am.  I did

25  some wrongdoings that I am not proud of, nor am I happy about

1  it.  With all due respect, Your Honor, I would like to ask for

2  forgiveness from you, Tory and his family, my family and the

3  community of East St. Louis.  I pray and ask that you allow me

4  a second chance in life so that I may continue to help raise

5  my children and grandchildren.  I desperately want them to

6  learn from my mistakes.  I desperately want them to learn from

7  my mistakes and need to be in their life so I may teach them

8  right from wrong and to respect all.  This is a major problem

9  within the African American household because we, I, as

10  fathers, are not there for our children.  I want to be one of

11  those great men that help break the cycle, please.

12          When I am away, I plan to participate in all of the

13  programs that are available to me.  I am also looking to

14  obtain my GED and college classes as well.  If able, upon my

15  release I would like to get a good paying job and enlist in

16  some of the good youth programs so that I can help the younger

17  children to stay focused on education and out of trouble.  I

18  wish not to reside in East St. Louis for so long after my

19  release because that's where all my problems and bad company

20  came from.  I want better for me and my family.  I need a

21  change of environment.  I need a new positive in life.  I plan

22  to relocate and start off fresh as soon as possible.

23          I am sorry for the trouble I caused and I thank you,

24  Your Honor, for allowing me to speak and given that you're

25  here to listen to me.  I pray no matter what comes from this

1  situation that I can become a better person, father and son.

2  Please consider.

3          THE COURT:  Okay.  Mr. Fenderson, I sentence the

4  whole person and your lawyer wanted to make certain that I did

5  that, that I consider your family, and I will.  But when I see

6  you, there is a real anomaly.  I mean I see a guy who has a

7  great family, apparently great father, etcetera, but when you

8  are not around them, you are a thug.  Do you agree with that?

9          MR. FENDERSON:  Yes, sir.

10         THE COURT:  So what do I do?  I mean what kind of

11 sentence does somebody like that get; top end, bottom, middle,

12 maximum, life, ten years, which is the minimum?  What do you

13 do with somebody who is that contradictory?

14         MR. FENDERSON:  It is hard for me to say coming from

15 me, Your Honor.  In all honesty, I would say the low end.

16 That is just because it is me, you know, but I know due to the

17 nature of my crime and the effect of the community and the

18 person that was hurt, I understand.

19         THE COURT:  If I give you low end -- I am going to do

20 the math.  My computer is not working.  Reid, would you do

21 some math for me?  Answer this question for me.  So if I give

22 you the low end, that is the 212 months, and you get credit

23 for good time, okay, meaning you do 85 percent.  You have

24 already done 16 months.

25         MR. FENDERSON:  Yes, sir.

1          THE COURT:  So credit for good time, you would

2    basically be doing 15 years, okay?  But subtract that year and

3    a third you've done, so you would be doing 13 and a half,

4    roughly, years from now.  How old are you now?

5          MR. FENDERSON:  39.

6          THE COURT:  So 39, plus, say, 14 years.  I am doing

7    it roughly.  You will be 53 years old when you get out.  That

8    is a long time.  You're still a young man.  But when you get

9    out with a low end sentence, given your criminal history

10   whether I give you low end, high end, whatever, given this

11   criminal history, if you catch another case you will go -- it

12   will be life.  There is just no question.  I am surprised you

13   weren't a career criminal this time.  It is a really strange

14   anomaly that you weren't an armed career criminal.  It is a

15   quirk in the guidelines.  You will be looking at life.  You

16   understand that?

17         MR. FENDERSON:  Yes, sir.

18         THE COURT:  Okay.  Anything else you want me to know?

19         MR. FENDERSON:  I am just sorry, Your Honor, and I

20   wish Tory was here so I could apologize to him to his face.

21         THE COURT:  I think he has a new identity and new

22   place to live and you will never see him again.  That is just

23   the way it is.  How about the other shooter?  Was the other

24   shooter charged?

25         MS. FISCHER:  He has not been charged at this time,

Your Honor.

THE COURT: All right. Go ahead and have a seat. One more question. Where have you been incarcerated?

MR. FENDERSON: Washington County Jail.

THE COURT: You been there the whole time?

MR. FENDERSON: Yes, sir.

THE COURT: All right, thank you.

The Court's obligation to sentence in Federal Court begins with me accurately calculating the Federal Sentencing Guidelines, using them as a starting point, but sentencing under 18, U.S.C. Section 3553, which is a Federal Sentencing Statute. Under that statute, it is my obligation to impose a sentence that is sufficient, but no greater than necessary to meet the goals and purposes of sentencing here in Federal Court. They are the need for the sentence imposed, first of all, to reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense. Second, to afford adequate deterrence to criminal conduct. Third, to protect the public from further crimes of the defendant. Lastly, to provide him with any needed education or vocational training, medical care or other correctional treatment in the most effective manner.

In doing that, I consider the kinds of sentences available, I endeavor to avoid unwarranted sentencing disparities among defendants who were found guilty of similar

conduct with similar records, and in doing all of that I

consider the nature and circumstances of the offense and the

history and characteristics of the defendant.

Counsel, as is my habit, I am going to touch on a few

of the factors.  If either side wants me to expand on one or

more, please let me know and I will gladly do that, otherwise,

I presume my explanation is legally and factually accurate and

sufficient for meaningful Appellate Court review.

Mr. Fenderson is a 39 year old male who pled guilty

to being a felon in possession of a firearm, attempting to

retaliate against a witness and discharging a firearm in

connection with the crime of violence.  His potential sentence

is up to life incarceration.  His relevant conduct involved

the possession of a firearm after having been previously

convicted of a felony offense and he possessed that firearm in

connection with another felony offense being possession with

intent to distribute marijuana.  He also committed the offense

of aggravated assault after he shot TR, who he suspected to be

a confidential source for law enforcement, resulting in

serious injury to TR.  He attempted to impede justice by

shooting TR or attempting to do so while on pre-trial

supervision.

His criminal history includes numerous traffic

convictions, conviction for driving under the influence, one

juvenile conviction for unlawful possession of controlled

1 substance, three ordinance convictions for city sticker

2 violations, unlawful possession of liquor by a minor and

3 disorderly conduct.  He has one misdemeanor conviction for

4 criminal damage to property and four felony convictions,

5 including unlawful delivery of controlled substance, there are

6 two of those, and involuntary manslaughter and unlawful

7 possession with intent to deliver cannabis.  He was serving a

8 term of probation during his participation in the instant

9 offense.  He has accepted responsibility for his actions in

10 this case.  All of this has been taken into consideration with

11 the guidelines.

12       In aggravation, because of the grouping rules, many

13 factors in the case that otherwise would have triggered

14 specific offense characteristics in the guidelines are ignored

15 by them.  Most importantly, his participation in a drug

16 conspiracy was not counted.  Had the drug guideline applied,

17 the sentence would have been increased to account for that

18 conduct.  It would have been enhanced because his residence

19 was fortified with steel bars and a surveillance camera under

20 2D1.1B12.  Additionally, despite three prior counts of

21 conviction for drug trafficking and a conviction for

22 involuntary manslaughter, he escapes treatment as either an

23 armed career criminal or career offender.  That is because of

24 how the drug convictions are counted.  Ironically, the

25 involuntary manslaughter conviction for shooting a man in the

1    head was not determined to be a crime of violence or violent

2    felony under prevailing Seventh Circuit law.  So those factors

3    are in aggravation, not considered by the guidelines.

4            In mitigation, he has an extraordinarily supportive

5    family.  Let me count them.  There are 12 people in the back

6    in support of him.  He was raised in a rough neighborhood

7    where he was exposed to guns, drugs, violence and gang

8    activity at an early age.  Both of his parents struggled with

9    addiction and he spent the majority of the formative years

10   with his grandmother.  I know he had a lousy upbringing, but

11   it is not lost on me a couple of his siblings have thrived and

12   done well despite the same environment.  He has an identified

13   substance abuse history and has expressed interest in

14   participating in treatment in the future.  He lacks a high

15   school diploma and GED and has limited employment history.

16   After considering all of the factors in 18, U.S.C. Section

17   3553 and in touching on just a couple of them, I am going to

18   impose sentence.

19           First of all, I have written at length about the

20   serious problem of drugs and guns in the East St. Louis metro

21   east community.  I note that the Government cited the Walter

22   Hill case in their Sentencing Memorandum.  I would commend

23   anyone to look at the Sentencing Memorandum I wrote in that

24   case about the history of drugs and guns in this community.

25   They breed violence and one of the reasons this community is

1  so pressed and depressed is because of drugs, guns, violence

2  and crime.  So the gun case is significant and serious.

3  Retaliating or attempting to retaliate against a witness is

4  very serious and using a weapon in connection with a crime of

5  violence is serious.  I think the sentence in this case has to

6  provide just punishment for him.  I think it also has to not

7  only deter him and protect the public from further crimes he

8  might commit, but -- That would be specific deterrence.  There

9  should be general deterrence so anyone considering retaliating

10 against a witness might look at this sentence and say, hey,

11 the potential risk is too great.

12        After considering all of the factors in 18, U.S.C.

13 Section 3553, I am going to impose a sentence that is at the

14 low end of the guidelines.  I choose that not because he does

15 not deserve a high end guideline sentence, but I choose it

16 because the difference between the high end and low end is

17 about two years.  By the time he gets out at age 53, if he

18 hasn't gotten the message, he is not going to get it at age

19 55.  The guidelines teach us the older you are, the less

20 likely to recidivate you are.  They also teach us given the

21 criminal history he has, he is likely to recidivate.  I am

22 thinking given the significant family support he has,

23 hopefully he will get the message and come out and not

24 recidivate.  That is why I am also going to place him on five

25 years supervised release so we can monitor him.  I am going to

1     fine him a total of $250 per count, which is $750.  I am

2     ordering restitution as indicated earlier in the amount of

3     $8,926 to TR and the place it should be sent will be in the

4     judgment.  Also, there is a $300 special assessment of $100

5     per count.

6           I am going to recommend the residential drug abuse

7     program for you.  You have to earn your way in.  It is not

8     automatic and you are unlikely to get any credit for time off

9     because of the serious nature and violent nature of your

10    offenses.  I commend you to try to get into it.  If you get

11    the drug problem off of your back, you are less likely to

12    recidivate.  When your counsel gets back to me with the BP 337

13    filled out, I'll recommend whatever institution we think you

14    qualify for.

15         If you can't pay your administrative fee and

16    restitution immediately, whatever amount remains when

17    supervised release begins will become a condition of your

18    supervised release.  Again, that will be five years on Count

19    4, three years on Counts 1 and 3, all concurrent and not

20    consecutive with each other.  You will pay in equal monthly

21    installments of $100 or ten percent of your net monthly

22    income, whichever is greater.

23         The judgment is going to read as follows with respect

24    to the specific sentence.  Total sentence is going to end up

25    to be 212 months, which is low end.  Here is how I arrive at

1   it.  80 months on Count 1 and 3 concurrent with each other,

2   12 months on Count 1 consecutive, or actually it should be

3   12 months on Count 3, consecutive to the 80 months imposed on

4   Count 1 to account for the enhanced penalty under 18, U.S.C.

5   3147 for the commission of an offense while on bond, and

6   120 months on Count 4 consecutive to Counts 1 and 3 and

7   consecutive to the 18, U.S.C. Section 3147 enhanced penalty.

8   The result is a final overall sentence of 212 months, which is

9   a low end guideline sentence.

10          Does the United States request any further

11   amplification of 3553.

12          MS. FISCHER:  No, Your Honor.

13          THE COURT:  Mr. Juengel?

14          MR. JUENGEL:  No, Your Honor.

15          THE COURT:  The record will show we went to side bar.

16          (Whereupon a sidebar discussion was held.)

17          THE COURT:  Mr. Fenderson, you have a right -- I

18   would also note one of the reasons I am choosing low end is he

19   has spent 16 months in the local jail.  That is tougher time

20   than the Federal system.  I also consider that.

21          You have a right to appeal the sentence and

22   conviction in this case if you want to do so.  Any appeal must

23   be filed within 14 days of me entering judgment or your rights

24   of appeal are gone forever.  If you can't afford an attorney

25   to handle the appeal, the Court will appoint one to represent

1   you at no charge.  The Court will waive the filing and

2   docketing fee, which together total $505 if you can't afford

3   that and the court reporter's fees for preparing the

4   transcript of proceedings in your case will be waived for you

5   also.  I think you have waived or given up your right to

6   appeal, however, because I did sentence you within the

7   guideline range, but if you think that does not apply to you,

8   you can present that theory to the Court of Appeals.

9       I am only imposing the Section 3147 enhancement on

10  Count 3, even though it is charged in both Counts 3 and 4,

11  because there was only one bond or condition of release order

12  that was violated and to apply it to both Counts 3 and 4 would

13  be double counting.

14      Does the Government request any amplification or

15  discussion of anything else?

16      MS. FISCHER:  No, Your Honor.  Thank you.

17      THE COURT:  Mr. Juengel?

18      MR. JUENGEL:  The only thing, and you may have said

19  this and I might have missed it, but on the restitution in

20  light of the long period he will be incarcerated, you may have

21  said the Court is waiving interest?

22      THE COURT:  I didn't say, but I will waive interest.

23      Also, Mr. Fenderson, until you get your GED, you will

24  not qualify in the Bureau of Prisons for any of the work

25  programs like Unicorp.  The first thing they'll do is have you

1  work on getting your GED.  Once you do that, if you qualify

2  for the Unicorp, you can get up and go to work, make some

3  money.  A lot will be taken away to pay for restitution, but

4  it beats sitting in your cell or watching TV to be able to get

5  up and work every day.

6      MR. FENDERSON:  Yes, sir.

7      THE COURT:  Do you have any questions I can answer

8  for you?

9      MR. FENDERSON:  No, sir.

10     THE COURT:  At this time the Court would entertain a

11  Motion to Dismiss Counts 2 and 5.

12     MS. FISCHER:  We would move for that pursuant to the

13  agreement.

14     THE COURT:  Granted, and your Motion to Withdraw

15  Government's 1 through 5 is granted, the exhibits.

16     Conditions of supervised release are listed in the

17  Presentence Report.  The defendant had no objection to those,

18  so they will be imposed.

19     Mr. Fenderson, I see you have signed a document

20  entitled Defendant's Full Waiver of Reading of Terms and

21  Conditions of Supervision in Open Court in a Sentencing

22  Proceeding.  By signing this, you understand that I won't be

23  reading the conditions to you, you understand them and you

24  agree they are to be imposed and you agree to the

25  justification for them, is that correct?

1          MR. FENDERSON:  Yes, sir.

2          THE COURT:  All right.  Court is in recess.  Good

3    luck.  Thank you, folks, for attending.  Thank you Marshals.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19     (Court is adjourned.)

20

21          I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
22
     SS/Barbara Kniepmann                    November 11, 2019
23

24

25